IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH SCOTT, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action<br>No. 15-7213 (JBS-AMD) |
| JOHN MANENTI, et al., | |
| Defendants. | **OPINION** |

APPEARANCES:

JOSEPH SCOTT, Plaintiff pro se
04194-015
FCI Fort Dix
PO Box 2000
Joint Base MDL, New Jersey 08640

CRAIG CARPENITO, United States Attorney District of New Jersey
     By: JESSICA O'NEILL, Assistant United States Attorney
Office of the United States Attorney General
401 Market Street, 4th Floor
Camden, New Jersey 08101
Attorneys for Defendants John Manenti, Ruben Morales, and the
United States of America

**SIMANDLE, District Judge:**

## I.    INTRODUCTION

This matter comes before the Court on the motion of

Defendants Dr. John Manenti, Dr. Ruben Morales, and the United

States of America for summary judgment. Docket Entry 110.

Plaintiff Joseph Scott opposes the motion. Docket Entries 113,

115. The motion is being considered on the papers pursuant to Federal Rule of Civil Procedure 78(b).

The principal issues to be decided are (1) whether Drs. Manenti and Morales exercised their medical judgment in their treatment of Plaintiff's right shoulder injury, and (2) whether Plaintiff's expert report by Registered Nurse Monica Scott complies with the "enhanced credential requirements" of New Jersey's affidavit of merit statute. The Court finds that there are no triable issues of fact as to whether Drs. Manenti and Morales were deliberately indifferent to Plaintiff's medical needs. The Court also finds that Plaintiff has not complied with New Jersey's requirements for an affidavit of merit in a malpractice action. Therefore, the Court will grant the summary judgment motion and dismiss the complaint with prejudice.

## II. BACKGROUND

### A. Procedural History

On September 30, 2015, Plaintiff submitted a civil complaint alleging Defendants violated his Eighth Amendment right to adequate medical care by, among other things, denying him an MRI of his shoulder after experiencing excruciating pain for nearly two years. Complaint, Docket Entry 1. The Court administratively terminated the complaint on October 14, 2015, for failure to pay the filing fee or submit an application to proceed *in forma pauperis*. Docket Entry 4. Plaintiff paid the

filing fee on October 21, 2015, and the Court reopened the case for review.

Prior to this Court's review of the complaint pursuant to 28 U.S.C. § 1915A,[1] Plaintiff filed two motions to amend the complaint seeking to add a "deliberate indifference" claim as well as a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680. First Motion to Amend, Docket Entry 11; Second Motion to Amend, Docket Entry 13. The Court permitted the complaint to proceed in part against Drs. Manenti and Morales, and the remainder of the defendants were dismissed. The Court denied Plaintiff's motions to amend without prejudice as the proposed amendments did not state valid claims. Order, Docket Entry 18. Plaintiff filed a third motion to amend containing a notice of claim form received by the Federal Bureau of Prisons ("BOP") on October 5, 2015 for $5000 due to the alleged negligence of FCI Fairton personnel. Third Motion to Amend, Docket Entry 27 at 7-10. The Court denied the motion as a FTCA claim may not be brought against an individual, only the United States. April 13, 2016 Order, Docket Entry 45. A fourth motion to amend seeking to add a FTCA claim against the United

---

[1] "The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a).

States was filed on May 6, 2016. Docket Entry 47. The Court granted the motion on June 27, 2016. Docket Entry 49. *See* Amended Complaint, Docket Entry 50.

In addition to his motions to amend the complaint, Plaintiff also filed a motion for a preliminary injunction requiring the BOP to perform an MRI of his right shoulder. Motion for Preliminary Injunction, Docket Entry 43. Once the United States was served with the amended complaint, the Court ordered a response to the motion. Order of November 18, 2016, Docket Entry 68. The motion was dismissed as moot on December 9, 2016 as Plaintiff had received the requested relief, arthroscopic surgery, on August 17, 2016. Docket Entry 73.

Drs. Manenti and Morales now move for summary judgment on Plaintiff's Eighth Amendment claim, and the United States moves for summary judgment on the FTCA claim. Plaintiff asserts there are factual questions requiring resolution by a jury. The Court decides the motion on the basis of the papers submitted, without oral argument, pursuant to Rule 78, Fed. R. Civ. P.

## B. Allegations in Pleadings

Plaintiff alleged in his amended complaint that a torn rotator cuff in his right shoulder went undiagnosed for over 24 months. Amended Complaint at 3. He stated the only treatment he received was cortisone injections. *Id*. He asserted he "was examined regularly by Medical Staff but there [was] a ongoing

pattern of ignoring" his condition as well as "arbitrary and burdensome procedures that resulted in interminable delays for long periods of time in order to provid[e] care." *Id.* at 5.

Plaintiff alleged he suffered excruciating pain in his right shoulder for two years that prevented him from sleeping, moving his arm, or leaving his cell for simple activities. *Id.* at 6. He filed a notice of claim with the BOP Northeast Regional Office on September 30, 2015. *Id.* at 7.

## C. Defendants' Statement of Material Facts

Joseph Scott was a federal inmate at FCI Fairton, New Jersey during the relevant time period. Defendants' Statement of Material Facts ("DSOF"), Docket Entry 110-2 ¶ 1. The BOP is responsible for providing inmate medical care. *Id.* ¶ 2. Dr. Morales, a physician, was the Clinical Director at Fairton. *Id.* ¶ 4. Dr. John Manenti was the Northeast Regional Medical Director. *Id.* ¶ 6.

Plaintiff first went to Health Services complaining of pain in his right shoulder on October 18, 2013. *Id.* ¶ 7. He told the nurse practitioner that he had been doing "dips" when "'when his shoulder gave out with a weird noise.'" *Id.* ¶ 9. He had been experiencing pain for about six months before coming to Health Services. *Id.* ¶ 8. He had history of pain in his left shoulder for two years "on-and-off" with pain down the arm. *Id.* ¶ 12. He denied having pain in his right shoulder most of the time,

except for when he slept. *Id.* ¶ 13. Plaintiff stated he lifted weights among other exercises, and the nurse practitioner described Plaintiff as "'heavily muscled.'" *Id.* ¶¶ 10-11. He wanted a cortisone shot in his right shoulder. *Id.* ¶ 14. The nurse practitioner noted Plaintiff had a normal range of motion and had a normal examination. *Id.* ¶ 15. She recommended Indomethacin, an x-ray, and an evaluation for a cortisone shot. *Id.* ¶ 26. Dr. Morales agreed with this treatment plan and ordered an x-ray, which was conducted on November 5, 2013. *Id.* ¶¶ 17-19. The radiologist concluded the findings were negative. *Id.* Dr. Morales performed a shoulder arthrocentesis on Plaintiff's right shoulder on November 27, 2013. *Id.* ¶ 20.

Plaintiff did not return to Health Services until February 11, 2014. *Id.* ¶ 21. Another nurse practitioner examined him. *Id.* ¶ 22. He complained that he was still having pain in his right shoulder. *Id.* ¶ 23. He asked for Indomethacin and for the x-ray results. *Id.* ¶ 24. The nurse practitioner examined Plaintiff and noted that he had a "normal active range of right shoulder motion, and his neurovascular status was intact." *Id.* ¶ 26. She did note that his shoulder was tender and described Plaintiff's shoulder condition as chronic. *Id.* ¶ 27. Plaintiff received a prescription for 50 milligrams of Indomethacin a day and was advised to stop lifting weights for six weeks. *Id.* ¶ 28.

Plaintiff requested a copy of his x-ray records on February 27, 2014 as he was "in excruciating pain." *Id.* ¶ 29.

Plaintiff's next visit to Health Services was six months later on August 14, 2014. *Id.* ¶ 31. A physician's assistant conducted the examination; Dr. Morales was not present. *Id.* ¶ 32. Plaintiff asserted the steroid injection he had received made his right shoulder pain worse. *Id.* ¶ 34. He denied working out, but the physician's assistant "noted that his upper body looked muscular with good definition." *Id.* ¶ 35. Plaintiff was provided a sling at his request. *Id.* ¶ 37.

Plaintiff requested to visit Health Services on October 22, 2014 and was seen on October 31 by the physician's assistant. *Id.* ¶¶ 38-39. His shoulder showed no improvement. *Id.* ¶ 40. He stated that he had not been using the sling provided at his last visit and "demanded an MRI." *Id.* ¶¶ 41-42. The physician's assistant recommended that Plaintiff have an orthopedic consultation. Dr. Morales agreed with and co-signed this recommendation. *Id.* ¶ 43. Plaintiff requested permission to visit Health Services again on December 22, 2014. *Id.* ¶ 44. A mid-level practitioner examined him on January 8, 2015. *Id.* ¶ 45. Plaintiff received a prescription for Meloxicam and was told that his request for the consult was pending. *Id.* ¶ 46.

Plaintiff saw the orthopedist, Dr. Peter Sarkos, on January 20, 2015. *Id.* ¶ 47. Dr. Sarkos found a "slight tenderness with

deep palpation over the right bicipital groove." *Id.* ¶ 48. He determined that Plaintiff's shoulder was "positive O'Brien test for cuff and SLAP." *Id.* His impression was that Plaintiff had a "right shoulder rotator cuff tear and a possible labral tear." *Id.* ¶ 49. Dr. Sarkos recommended a second cortisone shot even though Plaintiff had not improved with the first one. *Id.* ¶ 50. He gave Plaintiff an injection of Depo-Medrol and Lidocaine and indicated Plaintiff should be seen again in one month for a follow-up. *Id.* ¶¶ 50-51. He did not order an MRI scan at this visit. *Id.* ¶ 52. Dr. Morales reviewed Dr. Sarkos' report on January 28, 2015. *Id.* ¶ 53.

On February 17, 2015, Plaintiff returned to Health Services and was examined by a nurse practitioner. *Id.* ¶ 55. Plaintiff "reported increased shoulder pain, which was worse with movement and with raising his arm. He [] requested anti-inflammatory medication." *Id.* ¶ 56. He was prescribed more Meloxicam. *Id.* ¶ 57. He returned on February 23, 2015 claiming continuing pain. *Id.* ¶¶ 59-60. A mid-level practitioner examined him and found Plaintiff to have a normal range of motion but some tenderness in the right shoulder area. *Id.*

Plaintiff requested to go back to Health Services on March 1, 2015, claiming that he did not receive the prescribed Meloxicam. *Id.* ¶ 61. A mid-level practitioner saw him on March 9, 2015 and told him that "the pharmacy only issued a seven-day

supply for a 30-day period. Scott was advised to purchase over-the-counter medications from the commissary for other times as needed." *Id.* ¶ 63.

Dr. Sarkos re-evaluated Plaintiff on March 31, 2015. *Id.* ¶ 64. His "impression was right shoulder pain with a probable rotator cuff tear." *Id.* ¶ 65. He recommended an MRI of Plaintiff's right shoulder. *Id.* ¶ 66. The recommendation went to Fairton's Utilization Review Committee ("URC"), which Dr. Morales chaired. *Id.* ¶¶ 67-68. "Pursuant to BOP policy, the URC was required to submit the request for an MRI to the Regional Medical Office for review and approval if applicable." *Id.* ¶ 69. "The Regional Medical Office uses a criteria-based system called InterQual to conduct reviews, and approves of requests if they meet the InterQual criteria." *Id.* ¶ 70. The URC submitted the request for Plaintiff's MRI to the Regional Medical Office for approval. *Id.* ¶ 71.

Plaintiff requested a Health Services appointment for his shoulder on May 6, 2015 and was seen by a nurse practitioner on May 18, 2015. *Id.* ¶¶ 72-73. "At that visit, Scott said he could not perform exercises and refused exercise. Scott said he wanted an MRI and surgery." *Id.* ¶ 74. He was still waiting for regional approval of the MRI request. *Id.* ¶ 75. The Regional Medical Office denied the MRI request on June 16, 2015. *Id.* ¶ 76. "The reason for the decision not to approve was, in summary, that

'current evidence does not support testing in this clinical scenario.'" *Id.* ¶ 78 (quoting BOP000113).[2] "Specifically, the primary reviewer noted that the criteria for MRI testing were not met, because Scott had not met the criteria of documented exercise, physiotherapy, and occupational therapy trial for six weeks or more." *Id.* ¶ 79. Dr. Manenti, the secondary reviewer, agreed that Plaintiff's "clinical management" was incomplete. *Id.* ¶ 80.

Plaintiff requested a Health Services visit on August 4, 2015 to discuss the denial of the MRI. *Id.* ¶ 83. He saw a nurse practitioner on August 11, 2015 and complained of pain in his right shoulder. *Id.* ¶¶ 84-85. The nurse practitioner noted the recommendation of Dr. Manenti that Plaintiff attempt occupational therapy and physiotherapy before receiving an MRI. *Id.* ¶ 86. She initiated a consult request for the therapy. *Id.* ¶ 87. Plaintiff was scheduled to return on August 14, 2015 to learn the exercises, but he failed to appear. *Id.* ¶¶ 88-89. He submitted a complaint on August 15, 2015 "indicating his belief

---

[2] Plaintiff's medical records, Docket Entry 111, were sealed to protect his privacy. Order to Seal, Docket Entry 116. The Court will refer to these documents using their "BOP" Bates numbers. Subsequent to the Court's Order to Seal, Plaintiff filed a motion to unseal waiving his right to privacy and arguing that his medical records should be publicly accessible. Motion to Unseal, Docket Entry 117. The Court notes that Plaintiff did not file a timely objection to the motion to seal but will grant his motion.

that the clinical director had failed to carry out the medical recommendations of the regional medical director because Scott had yet to receive physical therapy." *Id.* ¶ 90. He submitted another complaint about not receiving physical therapy on August 17, 2015. *Id.* ¶ 91. On August 18, 2015, he was given a copy of the American Academy of Orthopedic Surgeons' shoulder exercises at an appointment with a nurse practitioner. *Id.* ¶¶ 92-93. He was instructed on how to perform these exercises and told he would be given a follow-up evaluation in six weeks. *Id.* ¶¶ 92-94.

Plaintiff's shoulder pain had not improved by the time of his follow-up appointment on September 22, 2015 in spite of performing the exercises. *Id.* ¶ 95. The nurse practitioner indicated she would resubmit the request for the MRI and recommend another consult with the orthopedist. *Id.* ¶ 96. Dr. Morales co-signed this recommendation. *Id.* ¶ 97. The URC submitted a new request for an MRI of Plaintiff's right shoulder on October 2, 2015. *Id.* ¶ 98. The request was approved on November 20, 2015. *Id.* ¶ 100. In the interim, Plaintiff had his Meloxicam prescription refilled at his request. *Id.* ¶ 99.

The MRI was performed on January 27, 2016. *Id.* ¶ 103. Dr. Sarkos reviewed the MRI and examined Plaintiff on March 1, 2016. *Id.* ¶¶ 104-05. He concluded Plaintiff "had a right shoulder SLAP tear with a partial rotator cuff tear." *Id.* ¶ 106. Dr. Sarkos

recommended Plaintiff follow-up with a surgical consultant, Dr. McAlpin. *Id.* ¶ 107. A Fairton mid-level practitioner reviewed Dr. Sarkos' recommendations on March 2, 2016 and submitted a consultation request to send Plaintiff to Dr. McAlpin. *Id.* ¶ 108. Dr. Morales reviewed Dr. Sarkos' report on March 7, 2016 and co-signed the request for a consultation with Dr. McAlpin the next day. *Id.* ¶¶ 109-10.

Plaintiff had an appointment with orthopedics on May 27, 2016 after which Dr. Morales submitted a request for surgery. *Id.* ¶¶ 111-12. "Regional review of a request for consultation can take up to 90 days. If consultation with a subspecialist is requested, regional review can take up to 90 days." *Id.* ¶¶ 113-14. Dr. McAlpin performed surgery on Plaintiff's right shoulder on August 17, 2016, repairing "a large SLAP tear and bursal and articular side rotator cuff tear." *Id.* ¶¶ 115-16. According to Dr. McAlpin, the biceps looked to be in good condition, so he did not perform a biceps repair or tenodesis. *Id.* ¶ 117. Plaintiff received discharge instructions and pain medication. *Id.* ¶ 118.

He saw a physician's assistant on August 24, 2016 for a follow-up appointment. *Id.* ¶ 119. The incision site was doing well, and the sutures were removed. *Id.* ¶ 120. Plaintiff was instructed on pendulum exercises. *Id.*

## D. Plaintiff's Statement of Material Facts

Plaintiff states he was first seen for shoulder pain on October 18, 2013. Declaration of Joseph Scott ("Plaintiff Dec."), Docket Entry 113 at 12, ¶ 4. Plaintiff concedes he received an x-ray of his right shoulder at some point. Plaintiff's Statement of Facts ("PSOF"), Docket Entry 113 at 14, ¶ 1. He also concedes Dr. Morales gave him a cortisone injection "to alleviate his excruciating right shoulder pain." *Id.* ¶ 2. *See also* Plaintiff Dec. ¶ 5. Between November 2013 and January 20, 2015, Plaintiff "was informed by Fairton medical staff to try to do physical therapy home exercises." Plaintiff Dec. ¶ 6. He began filing grievances requesting consultation with an orthopedic surgeon and an MRI scan because the pain was not subsiding. *Id.* ¶ 7.

Plaintiff alleges that Dr. Morales "refused to order any follow-up care and treatment to confirm the diagnosis of rotator cuff tear" and that "Defendants failed to follow accepted protocol for assessing their patient right shoulder chronic pain history." PSOF ¶¶ 3-4. He states that "Defendants failed to make a proper and timely assessment of the risk that the Plaintiff had developed a permanent injury" and "delayed access to a[n] Orthopedic Specialist to determine cause of pain." *Id.* ¶¶ 5-6.

Plaintiff submitted an expert affidavit from Monica Scott, R.N., M.S.N., opining that the medical care deviated from the standard of care. *Id.* ¶ 9; Declaration of Monica Scott ("Nurse Scott Dec."), Docket Entry 113 at 19. He further asserts that "Defendants denied prescribed treatment by the Orthopedic requesting a MRI be schedule" which caused him "irreparable injury due to the delayed access to a[n] Orthopedic, MRI, and surgery." PSOF ¶¶ 10-11.

## III. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.' In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "To defeat a motion for summary judgment, the nonmoving party must show that there is more than merely 'a scintilla of evidence' supporting his position, or 'some

14

metaphysical doubt as to the material facts." *Transamerica Occidental Life Ins. Co. v. Total Sys. Inc.*, 513 F. App'x 246, 249 (3d Cir. 2013) (quoting *Anderson*, 477 U.S. at 252; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## IV. ANALYSIS

Because Plaintiff does not dispute the Defendants' statement of facts regarding his medical history,[3] the Court deems Defendants' Statement of Facts undisputed for purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2); *see also N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Dev. Agency of the City of Atl. City*, 68 F. Supp. 3d 545, 549 (D.N.J. 2014).

## A. Eighth Amendment Claim

Drs. Manenti and Morales argue they are entitled to summary judgment on Plaintiff's Eighth Amendment claim as Plaintiff cannot prove they were deliberately indifferent to his serious medical needs. Alternatively, they argue they are entitled to qualified immunity.

---

[3] Plaintiff's "statement of facts" contain more legal conclusions than statements of facts. He also did not submit a responsive statement, as required by the Local Civil Rules. <u>See</u> Local Civ. R. 56.1(a) ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion. . . .").

"The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534, (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). "[P]rison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). To succeed on his Eighth Amendment claim, Plaintiff "must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his] medical needs' and (2) an objective showing that 'those needs were serious.'" *Id.* (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). Defendants do not argue Plaintiff's shoulder injury was not a "serious medical need," but rather that he has failed to prove the subjective element of deliberate indifference.

The Third Circuit has distinguished between "cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment." *U.S. ex rel. Walker v. Fayette Cty., Pa.*, 599 F.2d 573, 576 n.2 (3d Cir. 1979); *accord Pearson*, 850 F.3d at 535. "[M]ere allegations of malpractice do not raise issues of constitutional import. Nor

does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (internal citations omitted).

Plaintiff argues Drs. Manenti and Morales were deliberately indifferent to his shoulder pain because they "'fail[ed]' to provide any treatment beyond medication, and delay[ed] any referral to a specialist, who could provide or recommend a course of treatment." Plaintiff's Brief at 3. Accepting Plaintiff's construction of his claim as a delay or denial of care type of deliberate indifference claim, there is no presumption that defendants acted properly. *Pearson*, 850 F.3d at 537. "All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

The Court finds that no reasonable jury could conclude that any delay or denial of care by Drs. Manenti and Morales was motivated by non-medical factors. Dr. Manenti stated he denied the first request for an MRI of Plaintiff's right shoulder in early 2015 "because the clinical management of Scott's condition, including a documented trial of physical therapy, had not been completed." Manenti Declaration ("Manenti Dec.") Docket Entry 110-7 ¶ 15. Dr. Manenti certified that his decision was based on and "consistent with both the relevant InterQual

criteria as well as BOP's national clinical practices concerning shoulder injuries, which advise that common reasons for inmates not to show improvement include failure to stop aggravating activities and failure to perform rehab exercises for a long enough period of time." *Id.* ¶ 16. *See also* BOP Clinical Practice Guidelines, Management of Chronic Shoulder Pain (Dec. 2012), Docket Entry 110-6 at 6 ("Common reasons for inmates NOT to show improvement include failure to stop aggravating activities and failure to perform rehab exercises long enough (minimum of 8-12 weeks)."). He approved the MRI request once Plaintiff completed the physical therapy regime without improvement in his condition. Manenti Dec. ¶ 17. He stated that his "review of the requests for outside medical services for Scott's right shoulder, and [his] decisions associated with that review, were grounded in BOP's policies and clinical practice guidelines as well as [his] experience as a physician and Regional Medical Director." *Id.* ¶ 21.

Likewise, Dr. Morales provided evidence that he used his professional judgment to treat Plaintiff's shoulder. When Plaintiff initially came to Dr. Morales for treatment for his chronic shoulder pain in 2013, Dr. Morales took an x-ray of Plaintiff's shoulder and later performed a shoulder arthrocentesis when the x-ray had a negative result. Declaration of Dr. Ruben Morales ("Morales Dec."), Docket Entry 110-8 ¶¶ 14-

15; BOP000001 (describing Plaintiff's complaint as "chronic rt shoulder pain"). Plaintiff did not return for treatment until February 2014. BOP000024-25. He was informed of the x-ray results and advised to stop lifting weights for the time being. *Id.* He returned in August, at which time he was given a sling to wear for 8 weeks. BOP 000022-23. According to the provider, Plaintiff denied working out "yet his upper [body] looks muscular and with good definition." BOP000022. An exam revealed he had "full range of motion." *Id.* He came back in October and "demanded" an MRI. BOP000018. The notes for this encounter indicate Plaintiff stated he not been using the sling because "the velcro is damaged." *Id.* At this time, Dr. Morales co-signed a recommendation for Plaintiff to see an outside orthopedist, Dr. Sarkos. Morales Dec. ¶ 16. *See also* BOP000019-20. Dr. Sarkos did not recommend an MRI at this initial orthopedic consultation on January 20, 2015. DSOF ¶ 52; BOP000123-24.

Dr. Sarkos did not recommend an MRI until March 31, 2015. BOP000118. Dr. Morales agreed with that recommendation and submitted a request for approval to the Regional Medical Office on April 17, 2015 through the URC. Morales Dec. ¶ 20; BOP000117. That request was denied because Plaintiff had not completed a physical therapy regimen. When Nurse Rodriguez resubmitted the request for the MRI in September 2015 after Plaintiff completed physical therapy with no signs of improvement, Dr. Morales again

19

co-signed the recommendation. BOP000048. The MRI was approved on November 20, 2015 and conducted on January 27, 2016. BOP000104, BOP000148.

On March 1, 2016, Dr. Sarkos recommended that Plaintiff consult with a surgeon. BOP000148. Dr. Morales reviewed that recommendation on March 8, 2016, BOP000149, and submitted the recommendation for surgery, which included "arthroscopic subacromial decompression, possible rotator cuff, SLAP repair, and possible bicep tenodesis." DSOF ¶ 112; BOP000135. Plaintiff had rotator cuff surgery on his right shoulder on August 17, 2016. BOP000152-53.

"[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). In support of their motion for summary judgment on Plaintiff's deliberate indifference claim, Drs. Manenti and Morales have provided evidence to support they were using their medical judgment. They have provided declarations describing their reasons behind their actions and the medical justifications behind requiring Plaintiff to complete physical therapy before approving his MRI. Plaintiff's medical records indicate that he was continuously being attended to by Fairton medical personnel. Notably, Plaintiff does not contest Defendants' statement of facts

describing his general course of treatment. The record before the Court indicates that Plaintiff was being given regular medical care for his shoulder and Drs. Manenti and Morales used their medical judgments to treat him.

Plaintiff has provided no evidence in opposition to summary judgment that the doctors' decisions were based on something other than their medical judgment. Nurse Scott's declaration does not create any factual issues. She does not assert the doctors did not exercise their medical judgment in treating Plaintiff or in requiring Plaintiff complete physical therapy before an MRI was ordered. *See generally* Nurse Scott Dec. "If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) (emphasis in original). There is nothing in Nurse Scott's affidavit such that a reasonable jury could conclude Drs. Manenti and Morales were deliberately indifferent to Plaintiff's medical needs.

Plaintiff's "disagreement about his course of treatment, namely, that an MRI should have been immediately ordered, does not demonstrate the defendants were deliberately indifferent to his medical needs." *Rhines v. Bledsoe*, 388 F. App'x 225, 227 (3d

Cir. 2010) (per curiam). The actions taken by Drs. Morales and Manenti "undisputedly indicate that [they] employed professional judgment, and did not act with the 'obduracy and wantonness' necessary to sustain an Eighth Amendment violation." *Gaines v. Busnardo*, 735 F. App'x 799, 804 (3d Cir. 2018) (per curiam) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (internal citation omitted). Thus, they are entitled to summary judgment upon Plaintiff's claim of their deliberate indifference to his serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.

## B. Federal Tort Claims Act – Medical Negligence

The United States moves for summary judgment on the FTCA claim, arguing that Nurse Scott's affidavit of merit is deficient under New Jersey law. "The FTCA waives sovereign immunity and grants district courts jurisdiction over tort claims against the United States 'under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred*.'" *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000) (quoting 28 U.S.C. § 1346(b)(1))(emphasis in original), *modified on other grounds by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003). "[T]he court must evaluate whether the United States would be liable under the 'whole law' of the state in which the act or omission

occurred." *Id.* (citing *Richards v. United States*, 369 U.S. 1, 6 (1962)). FCI Fairton is in New Jersey; therefore, New Jersey substantive law governs Plaintiff's FTCA claim. *See also In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 362 (3d Cir. 2001), *as amended* (Oct. 10, 2001) ("[T]he FTCA does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court.").

New Jersey's affidavit of merit statute requires, in relevant part, that a plaintiff bringing a professional malpractice or negligence claim

> provide each defendant with an affidavit of an
> appropriate licensed person that there exists a
> reasonable probability that the care, skill or knowledge
> exercised or exhibited in the treatment, practice or
> work that is the subject of the complaint, fell outside
> acceptable professional or occupational standards or
> treatment practices. . . .

N.J. Stat. Ann. § 2A:53A-27 ("Section 27"). The Patients First Act, N.J. Stat. Ann. § 2A 53A-41 ("Section 41"), later amended Section 27 to require "[i]n the case of an action for medical malpractice, the person executing the affidavit shall meet the requirements of a person who provides expert testimony or executes an affidavit as set forth in [Section 41]." N.J. Stat. Ann. § 2A:53A-27. Section 41, in turn, "'establishes qualifications for expert witnesses in medical malpractice actions' and 'provides that an expert must have the same type of

practice and possess the same credentials, as applicable, as the defendant health care provider, unless waived by the court.'" *Meehan v. Antonellis*, 141 A.3d 1162, 1171 (N.J. 2016) (quoting Assembly Appropriations Comm., Statement to Assembly No. 50, at 2 (2004)). Because Dr. Manenti and Morales are physicians, these "enhanced credential requirements" apply to Plaintiff's affidavit of merit.

"The basic principle behind [Section 41] is that 'the challenging expert' who executes an affidavit of merit in a medical malpractice case, generally, should 'be equivalently-qualified to the defendant' physician." *Buck v. Henry*, 25 A.3d 240, 247 (N.J. 2011) (quoting *Ryan v. Renny*, 999 A.2d 417, 436 (N.J. 2010)). *See also Lomando v. United States*, 667 F.3d 363, 382-83 (3d Cir. 2011). The New Jersey Supreme Court noted three distinct categories created by Section 41: (1) physicians who are specialists in a field but who are not board certified in that specialty; (2) physicians who are specialists and who are board certified in that specialty; and (3) "general practitioners." *Buck*, 25 A.3d at 247 (citing N.J. Stat. Ann. § 2A:53A-41(a),(b)). The necessary "enhanced qualifications" of the affiant depends on which category the defendant physician belongs.

Dr. Manenti is a Doctor of Osteopathic Medicine with a degree from Ohio University. Manenti Dec. ¶ 3. He is board

certified by the American College of Osteopathic Family Physicians. Manenti *curriculum vitae*, Docket Entry 110-7 at 6. Dr. Morales has a medical degree from Perpetual Help College of Medicine in the Philippines and had his residency in internal medicine at Bergen County Medical Center. Morales Dec. ¶¶ 2-3. Dr. Manenti does not state what field his certification is in; therefore, the Court is unable to determine if Plaintiff's claims involved Dr. Manenti's field of certification. The Court therefore treats both doctors as general practitioners for purposes of this motion.

For general practitioners, section 41 states:

If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to:

(1) active clinical practice as a general practitioner; or active clinical practice that encompasses the medical condition, or that includes performance of the procedure, that is the basis of the claim or action; or

(2) the instruction of students in an accredited medical school, health professional school, or accredited residency or clinical research program in the same health care profession in which the party against whom or on whose behalf the testimony is licensed; or

(3) both.

N.J. Stat. Ann. § 2A:53A-41(b). Nurse Scott's affidavit falls short of these requirements. She states that she currently works full time as a Nurse Educator at an unnamed nursing school.

Nurse Scott Dec. ¶ 1. It is not clear from her limited affidavit that she was employed there "during the year immediately preceding the date of the occurrence that is the basis for the claim or action . . . ." N.J. Stat. Ann. § 2A:53A-41(b). In addition, a nursing school is not "the same health care profession in which the party against whom or on whose behalf the testimony is licensed" in this instance as Drs. Manenti and Morales are licensed physicians, not nurses. *Id.* § 2A:53A-41(b)(2). She further certifies that "80 percent of [her] work is providing nursing education to nursing students. . . . The other 20 percent is working on the rehabilitation floor where [she] provide[s] care to clients with joint issues, post-operative joint surgeries and stroke clients." Nurse Scott Dec. ¶ 2. The majority of her practice is dedicated to education, not "active clinical practice" as required by Section 41. N.J. Stat. Ann. § 2A:53A-41(b)(1). Nurse Scott is therefore not qualified under Section 41 to provide an affidavit of merit as to the standard of care provided by Drs. Morales and Manenti. *See also Meehan*, 141 A.3d at 1173 ("[S]ubsection [b] limits the expert or affiant to a physician . . . .").

Failure to provide a sufficient affidavit of merit requires dismissal of the claim.[4] *Id.* at 1169. The Court will therefore grant the United States' motion for summary judgment on the FTCA claim.

## C. Qualified Immunity

Defendants also argue they are entitled to summary judgment under the doctrine of qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (internal citation and quotation marks omitted). The first prong of the analysis "asks whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (internal quotation marks and citations omitted) (alterations and omissions in original). As the Court has already granted summary judgment to defendants on the merits, it is unnecessary to address qualified immunity

---

[4] The waiver provision of N.J. Stat. Ann. § 2A:53A-41(c) does not apply as the Court has applied the more lenient general practitioner standard.

beyond noting that Plaintiff has failed to prove a violation of a statutory or constitutional right.

**V. CONCLUSION**

For the reasons stated above, summary judgment is granted. An accompanying Order will be entered.


**November 27, 2018**          **s/ Jerome B. Simandle**
Date                           JEROME B. SIMANDLE
                               U.S. District Judge